**Paul CUMMINS, Plaintiff-Appellant,**

v.

**PARKER SEAL COMPANY,**
**Defendant-Appellee.**

No. 74–1607.

United States Court of Appeals,
Sixth Circuit.

May 23, 1975.

Thomas L. Hogan, James C. Hickey, Ewen, MacKenzie & Peden, Louisville, Ky., for plaintiff-appellant.

Bennett Clark, Stoll, Keenon & Park, Lexington, Ky., for defendant-appellee.

Before PHILLIPS, Chief Judge, and CELEBREZZE and McCREE, Circuit Judges.

PHILLIPS, Chief Judge.

Appellant Paul Cummins brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging that .he had been illegally discharged on the basis of his religion. In essence the complaint charged that Appellant's employer, Parker Seal Company, did not perform its duty under the Act to accommodate Appellant's religious practices and observances. The District Court entered judgment in favor of the Company, and this appeal followed. For the reasons stated below, we reverse and remand for further proceedings.

On December 9, 1958, Appellant was hired as a production scheduler in the Banbury Department of Appellee's Berea, Kentucky plant. In May 1965, Ap-pellant was made supervisor of the first (7:00 a. m. to 3:00 p. m.) Banbury shift. As a supervisor, he was salaried and was obligated to work whatever hours were scheduled, including Saturdays.

In July 1970, Appellant joined the World Wide Church of God, which forbids work on the Sabbath (Friday sundown to Saturday sundown) and on certain holy days. From that time Appellant refused to work on Saturdays. After complaints arose from fellow supervisors who were forced to substitute for him on Saturdays, Appellant was discharged.

Appellant filed a charge of religious discrimination against Appellee with the United States Equal Employment Opportunity Commission (EEOC) and a similar complaint with the Kentucky Commission on Human Rights (KCHR). On April 12, 1972 after a hearing, the KCHR dismissed the charge.[1] On September 5, 1972, the EEOC issued a right to sue letter, and Appellant filed this action on September 26, 1972.

The parties stipulated that the transcript of the KCHR hearing should serve as the complete factual record in the District Court. On the basis of that transcript the District Court found as follows:

The plaintiff failed to appeal the order of dismissal of the Kentucky Commission on Human Rights, and that order became a final order on May 12, 1972. On September 26, 1972, the plaintiff filed the present action which is identical in all respects—parties, facts, law sought to be applied and remedy sought—with the case previously tried before the Kentucky Commission on Human Rights.

It appears that the plaintiff was afforded a full and fair hearing before the Kentucky Commission on Human Rights and that Commission properly found that the defendant's attempts to accommodate itself to the plaintiff's religious needs was causing the defendant undue hardship.

1. Order of Ky. Comm'n on Human Rights, No. 231–E (April 12, 1972).

This Court finds from the entire record herein that the defendant made a reasonable accommodation to the plaintiff's religious needs and that no further accommodation could be made at the time of the defendant's dismissal from employment without creating an undue hardship on the employer's business.

The defendant was therefore justified in discharging the plaintiff and a Judgment will therefore this date be entered for the defendant and dismissing the complaint herein.[2]

On appeal, Appellant argues that the District Court's findings are erroneous and that his employer's conduct did amount to religious discrimination under Title VII. Appellee asserts three alternative bases for affirmance: (1) that the KCHR order has res judicata effect; (2) that the District Court correctly concluded that Appellee reasonably accommodated Appellant's religious practices as fully as Title VII requires; and (3) that the rule requiring employers to accommodate their employees' religious practices violates the establishment clause of the first amendment. We discuss each of these issues in turn.

## I. Res Judicata

■ Appellee asserted in its brief that Appellant's complaint should have been dismissed because the KCHR's order against Appellant has res judicata effect, barring relitigation of the same claim rejected by the state tribunal. It cited Batiste v. Furnco Construction Corp., 350 F.Supp. 10 (N.D.Ill.1972), in support of this contention.

At oral argument Appellee abandoned this defense in view of Batiste's reversal by the Seventh Circuit, Batiste v. Furnco Construction Corp., 503 F.2d 447 (7th Cir. 1974).

Insofar as the District Court's decision may rest on the doctrine of res judicata, it cannot stand. A party is not foreclosed from pursuing his federal remedy un-der Title VII because he has first been a party to a state proceeding. Cooper v. Philip Morris, Inc., 464 F.2d 9 (6th Cir. 1972).

## II. Reasonable Accommodation

The basis of Appellant's complaint was 42 U.S.C. § 2000e, as it existed before its 1972 amendment. Section 2000e–2, which has not itself been amended, states in relevant part,

(a) It shall be an unlawful employment practice for an employer—

(1) . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin . . ..

An EEOC Regulation, 29 C.F.R. § 1605.1 (1974), which was in force at the time of Appellant's discharge, provides as follows:

§ 1605.1 Observation of the Sabbath and other religious holidays.

(a) Several complaints filed with the Commission have raised the question whether it is discrimination on account of religion to discharge or refuse to hire employees who regularly observe Friday evening and Saturday, or some other day of the week, as the Sabbath or who observe certain special religious holidays during the year, and as a consequence, do not work on such days.

(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially sim-

---

**2.** District Court Memorandum Opinion, No. 2432 (E.D.Ky., filed March 20, 1974).

ilar qualifications during the period of absence of the Sabbath observer.

(c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable.

(d) The Commission will review each case on an individual basis in an effort to seek an equitable application of these guidelines to the variety of situations which arise due to the varied religious practices of the American people.

The consistency of this Regulation with pre-1972 Title VII was upheld in Reid v. Memphis Publishing Co., 468 F.2d 346 (6th Cir. 1972). As we noted there, a 1972 amendment to Title VII, which incorporates the substance of this Regulation, shows that the Regulation "did express the prior intention of Congress.[3] 468 F.2d at 351. Because Appellant's discharge occurred before the enactment of the 1972 amendment, his claim is governed by Regulation 1605. However, for purposes of this case there is no difference between the Regulation and the amendment. The question under either provision is whether Appellee met its burden of proving that no reasonable accommodation to Appellant's Sabbath observance was possible without imposing an undue hardship on the conduct of Appellee's business.

The District Court found that Appellee "made a reasonable accommodation to [Appellant's] religious needs and that no further accommodation could be made at the time of [Appellant's] dismissal from employment without creating an undue hardship on the employer's business." The court did not specify what "undue hardship" would have resulted and did

not explain why an accommodation that was reasonable for over a year (from July 1970, when Appellant joined the World Wide Church of God, until his discharge) suddenly became unreasonable in September 1971.

Our standard of review is limited when reviewing factual findings, Fed.R. Civ.P. 52(a), but is unlimited when determining whether the District Court committed errors of law. Because the District Court worded its findings in conclusory fashion, it is necessary to review the evidence presented to the KCHR, which constitutes the record in this case.

The first witness to testify before the KCHR was Rev. Kelly H. Barfield of the World Wide Church of God. His testimony was that as a member of his congregation Appellant was not permitted to work from Friday sunset to Saturday sunset and on seven holy days corresponding to Jewish observances.

Appellant was the second witness. He testified that the Berea plant's operations consisted of a Stock Preparation Department and the Banbury Department. To go from one to the other required passing through a sliding door that separated the Departments. When both Departments were working at capacity, each normally had one supervisor. When necessary, a single supervisor could handle both Departments and this was common practice when shifts were operating at less than full capacity. While Appellant was the only supervisor specifically assigned to the Banbury Department, normally he worked only during the *first* shift (from 7:00 a. m. to 3:00 p. m., Monday through Friday), and no supervisor was assigned to the lighter second and third shifts. A supervisor from the Stock Preparation Department covered these shifts. This was feasible because the supervisor's major responsibility was to schedule production after securing orders from clients. Appellant

**3.** The 1972 amendment added the following paragraph to § 2000e:

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates

that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

testified that he thus spent "a very small amount of time observing" his men.

Appellant testified that upon joining the World Wide Church of God, he informed Plant Manager Saylor that he could not work Saturdays, and Saylor gave permission for this. Appellant testified that Stock Preparation supervisors substituted for him on Saturdays and that he was available to substitute for them "at any other time other than my Sabbath or an annual holy day."

When L. G. Haddock replaced Saylor as the Plant Manager in November 1970, he told Appellant that his no-Saturdays schedule would be acceptable "as long as it don't cause any problems," in Appellant's words. In August 1971 Haddock told Appellant that he had received a complaint from another supervisor about his not working on Saturdays and that he would have to start working on Saturdays. On September 3, 1971, Haddock announced that he needed a Banbury supervisor who could work six days a week, that he could not transfer Appellant "because there were supposed to be no down-grades," and that he was forced to terminate Appellant that day.

Appellant testified that he tried to schedule his vacation to coincide with some of his Church's holy days and that the efficiency and safety of the Banbury Department did not suffer with the Stock Preparation supervisor covering the Banbury Department, so long as Appellant had done proper scheduling. Appellant stated that the company allowed two employees under his supervision not to work on Sundays for religious reasons.

The third witness was Mr. Conley Saylor, the Berea Plant Manager until November 1970. He testified that in the summer of 1970 the supervisory staff was working from ten to fourteen hours a day because of extra demand imposed by a strike at Appellee's Lexington plant. Despite this, Saylor did not call in a separate supervisor for the Banbury Department on Saturdays because "its always been kind of a set up down through the years that if the Banbury Supervisor was not there the Stock Prep. Supervisor covered both sides of it." He stated that Appellant "did a very adequate job" as Banbury Department supervisor. Saylor testified that Stock Preparation Supervisor Webb had told him that he was "tired of having to work so many hours when [Appellant] was not even working Saturdays." Saylor said that it was not good operating procedure to have one supervisor for both departments but that this procedure had been used for years especially when shifts were light, so that problems with production were "nothing related to [Appellant's] situation."

The fourth witness was Mr. Oscar Fain, a Stock Preparation supervisor and Appellant's brother-in-law. Fain testified that Appellant had substituted for him three times and that he had volunteered to cover for Fain anytime other than a Sabbath or holy day. He said there had been dissension among the supervisors because of Appellant's no-Saturdays rule and that he had told Plant Manager Haddock "that I respected [Appellant's] religion but that if he was scheduled to work, he should work on Saturday."

Mr. Chester Webb, also a Stock Preparation supervisor, was the fifth witness. He testified that when covering both the Banbury shift and the Stock Preparation Department, he "just went over there to make sure they were working and there wasn't nothing down, any machinery broken down or anything like that." He did not complain to Haddock about Appellant's not working on Saturdays, though he did complain to a supervisor, Mr. Hunt, that he had to work on every Saturday work was scheduled. Webb testified that Appellant volunteered to and did fill in for him when asked.

The sixth witness, Mr. Bobby Abrams, replaced Appellant at the Banbury Department after his discharge. He testified that Mr. Hunt had told him Appellant's failure to work scheduled hours was the reason for his discharge. Abrams now works whenever work is

scheduled, including approximately every other Saturday. He testified that he spends seven hours of an eight-hour day supervising his men and one hour scheduling.

Mr. L. G. Haddock, Plant Manager from November 1970 through Appellant's dismissal, was the seventh witness. Several excerpts from his testimony are particularly relevant, as it was Haddock who fired Appellant.

Q–25. Why was Paul Cummins fired from Parker Seal Company?

A. Basically because he could not work Saturdays but it goes further than that, it was a fact that he was not co-operating with the fellows down in the Stock Prep. Department.

Q–26. But basically it was because he wouldn't work Saturday?

A. That was the base of the problem, yes. The problem was that he could not work with the other Supervisors, or would not.

Q–27. What do you mean, work with the other Supervisors?

A. In the Stock Prep. Department which is adjacent to the Banbury, we had three (3) Supervisors, one (1) on each shift. During July and August of 71 we had a vacation schedule in which during four (4) straight weeks, at least one (1) of those fellows was on vacation and during that time the other two (2) guys were covering twelve (12) hours a day and we were working six (6) days a week then. They were covering twelve (12) hours a day, six (6) days a week, or seventy-two (72) hours each. And Paul at that time was working eight (8) hours a day, five (5) days a week. And I had complaints.

\*     \*     \*     \*     \*     \*

Q–32. Did you ever ask Paul to work on Saturdays?

A. No sir.

Q–33. But you fired him for not working Saturdays?

A. I asked him, I think it was two (2) weeks before he left, I asked him if there was any—I knew he had adopted this religion a year and a half or two (2) years ago or so, and I did ask him if there was any possibility of his being able to change his ideas or anything like that and he told me then that he was firmly fixed with his religion.

Q–34. Is that when you decided to fire him?

A. It was after that.

\*     \*     \*     \*     \*     \*

His religion doesn't bother me, didn't bother me at that time, one way or the other. The fact that he could not work Saturday did. We run a plant that operates six (6) days a week a good percentage of the time. Paul, in a responsible position, running a department, had to be there if that department was to function the way it should.

\*     \*     \*     \*     \*     \*

Q–53. There's a problem, I can understand, but I don't understand what deep problem Paul had that he had to volunteer to another Supervisor to work?

A. Well, when I get complaints from two (2) out of three (3) Supervisors of a department because they are working seventy (70) hours a week and Paul is only working forty (40) hours a week, then I had a problem between Supervisors. In a group of seventeen (17) Supervisors, who I was trying to weld into a group, a team, you can't do that if one (1) of them is going to be a loner.

A fair analysis of Haddock's testimony is that Appellant's no-Saturdays rule

caused resentment among fellow supervisors. Haddock did not force Appellant to work longer weekday hours by ordering him to substitute for other supervisors at the end of his shift, as Haddock expected Appellant to volunteer to do this. Although Appellant did volunteer to work for his colleagues at any time other than his Sabbath and holy days, he was rarely asked to substitute. Instead, Haddock decided that Appellant had become a "loner," gave him a choice between giving up his religion or his job, and fired him when Appellant did not change his religious convictions.

The final witness was Mr. Ray Kuhn, General Manager of the Division that included Appellant's Department. He testified that there had been production problems in 1970 and 1971, which required extra efforts by all management personnel. As a member of Appellee's Cost Goal Program, Appellant had been expected to exercise individual initiative. Kuhn testified that Appellant "was discharged because his refusal to work on Saturday was causing considerable consternation and problems with the rest of our employees who were being required to work a full shift." He testified that Sunday work was not scheduled to accommodate Appellant, adding that "I have never had to ask my employees to work Sunday."

A fair reading of the KCHR transcript indicates that the major reason for Appellant's discharge was, in the words of General Manager Kuhn, the "considerable consternation and problems with the rest of our employees who were being required to work a full shift." In short, Appellant's fellow supervisors resented having to work on Saturdays while Appellant was not forced to do so.

■■■ On this record, we see no substantial evidence to support the District Court's conclusion that accommodation of Appellant's religious practices would have imposed an undue hardship on the conduct of Appellee's business. The objections and complaints of fellow employees, in and of themselves, do not constitute undue hardship in the conduct of an employer's business. If employees are disgruntled because an employer accommodates its work rules to the religious needs of one employee, under EEOC Regulation 1605 and § 2000e(j) such grumbling must yield to the single employee's right to practice his religion. Moreover, the fact that Saturday Sabbath observance by one employee forces other employees to substitute during weekend hours does not demonstrate an undue hardship on the employer's business. It is conceivable that employee morale problems could become so acute that they would constitute an undue hardship. The EEOC, in interpreting Regulation 1605, has noted the possibility of undue hardship when the employer can make a persuasive showing that employee discontent will produce "chaotic personnel problems." EEOC Decision No. 72–0606 (Dec. 22, 1971), CCH EEOC DEC. ¶ 6310, at 4555 (1972); EEOC Decision No. 71–463 (Nov. 13, 1970), CCH EEOC DEC. ¶ 6206, at 4350 (1972).

In the case at bar, however, Appellee has shown no such dire effect upon the operation of its business. To the contrary, the complaints of Appellant's fellow supervisors seem both mild and infrequent. In addition, it appears that Appellee might have alleviated at least some of the dissension if it had pursued a more active course of accommodation. For example, Appellee's officials could have required Appellant to work longer hours on week days or on Sundays. They could have reduced Appellant's salary commensurately with his shorter work week. They could have taken pains to ensure that Appellant substituted for his colleagues on an equitable basis, rather than assuming that the co-workers would make appropriate demands upon Appellant.

Appellee was inconvenienced by Appellant's no-Saturdays rule, but to call the inconvenience shown on this record "undue hardship" would be to venture into "an Alice-in-Wonderland world where words have no meaning." Welsh v. United States, 398 U.S. 333, 354, 90 S.Ct. 1792, 1803, 26 L.Ed.2d 308 (1970)

(Harlan, J., concurring). Undue hardship is something greater than hardship, and Appellee did not demonstrate in the record below how accommodation to Appellant's religious practices would have imposed an unreasonable strain on its business, having lived with the situation for over one year before Appellant's discharge.

To the extent, therefore, that the District Court's decision rested on a finding that no accommodation of Appellant's religious practices was possible without an undue hardship upon Appellee's business, we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Accordingly, the District Court's finding is clearly erroneous and cannot stand. Parmer v. National Cash Register Co., 503 F.2d 275, 277 (6th Cir. 1974).

We conclude that Appellee did not reasonably accommodate Appellant's religious practices and that Appellee has not shown that such an accommodation would have imposed an undue hardship on the conduct of its business. Thus by discharging Appellant, Appellee has discriminated against him on the basis of his religion in violation of Title VII of the Civil Rights Act of 1964.

### III. First Amendment

■ Appellee seeks to sustain the District Court's decision upon the ground that 29 C.F.R. § 1605.1 (1974) and 42 U.S.C. § 2000e(j) are laws "respecting an establishment of religion" and therefore invalid under the first amendment. Appellee argues that the reasonable accommodation rule fosters religion by requiring private employers to defer to their employees' religious idiosyncrasies. Appellee points out that under the rule an employer may be required to excuse an employee from Saturday work to attend church, but an atheistic employee who wishes to go fishing on Saturdays enjoys no similar right under the Civil Rights Act. Thus Appellee believes the rule constitutes a governmentally mandated preference for religion that is impermissible under the first amendment.

In Dewey v. Reynolds Metals Co., 429 F.2d 324 (6th Cir. 1970), aff'd by an equally divided Court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971), this court warned that to construe the Civil Rights Act "as authorizing the adoption of Regulations which would coerce or compel an employer to accede to or accommodate the religious beliefs of all of his employees would raise grave constitutional questions of violation of the Establishment Clause of the First Amendment." 429 F.2d at 334. Two years later, in Reid v. Memphis Publishing Co., 468 F.2d 346 (6th Cir. 1972), we made the following statement:

> [W]e do not overlook the fact that the Dewey majority in our court expressed doubts about the constitutional validity of the E.E.O.C. regulation (29 C.F.R. 1605.1 (1970)) which is applicable to the refusal to hire appellant Reid.

.    .    .    .    .

> Whatever doubts there may have been about the constitutionality of this regulation or its consistency with the statute have been, we believe, laid to rest by a unanimous Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). While *Duke Power* dealt with racial discrimination and our current concern is with religious discrimination, the Equal Employment Statute treats them similarly. 468 F.2d at 349–50.

However, in *Reid* we did not discuss specifically the establishment clause problem.

In Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Supreme Court outlined the three standards that any law must meet to survive an establishment clause challenge. In order to pass constitutional muster, a law (1) "must reflect a clearly secular legislative pur-

pose," (2) "must have a primary effect that neither advances nor inhibits religion," and (3) "must avoid excessive government entanglement with religion." 413 U.S. at 772–73, 93 S.Ct. at 2965. We conclude that 42 U.S.C. § 2000e(j) and 29 C.F.R. § 1605.1 satisfy these tests and thus are not inconsistent with the first amendment.

First, we believe that Regulation 1605 and § 2000e(j) are sustained by an adequate secular purpose. The reasonable accommodation rule, like Title VII as a whole, was intended to prevent discrimination in employment. Specifically, the rule was designed to put teeth in the existing prohibition of religious discrimination. Senator Randolph, who proposed the amendment that became § 2000e(j), stated his purpose as follows:

> Mr. RANDOLPH: Mr. President, freedom from religious discrimination has been considered by most Americans from the days of the Founding Fathers as one of the fundamental rights of the people of the United States. Yet our courts have on occasion determined that this freedom is nebulous, at least in some ways. So in presenting this proposal to S. 2515, it is my desire and I hope the desire of my colleagues, to assure that freedom from religious discrimination in the employment of workers is for all time guaranteed by law. 118 Cong.Rec. 705 (1972).

Surely this is a far cry from cases such as Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), in which the Supreme Court struck down an Arkansas statute prohibiting public schools and universities from teaching the Darwinian theory of evolution. The Court concluded that the law sprang from "fundamentalist sectarian conviction" and was intended "to suppress the teaching of a theory which, it was thought, 'denied' the divine creation of man." 393 U.S. at 107–09, 89 S.Ct. at 273.

In addition, we think that Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), although obviously distinguishable from the case at bar, does set forth a rationale that is applicable here. In *Gillette* the Supreme Court rejected an establishment clause challenge to the draft exemption available to any person "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form." 50 U.S.C. App. § 456(j). The petitioners argued that § 456(j) was designed to foster or favor religious sects that oppose war in any form, at the expense of sects forbidding participation in particular, "unjust" wars.

The Court concluded that § 456(j) "serves a number of valid purposes having nothing to do with a design to foster or favor any sect, religion, or cluster of religions. There are considerations of a pragmatic nature, such as the hopelessness of converting a sincere conscientious objector into an effective fighting man . . . but no doubt the section reflects as well the view that 'in the forum of conscience, duty to a moral power higher than the state has always been maintained.' United States v. Macintosh, 283 U.S. 605, 633, 51 S.Ct. 570, 578, 75 L.Ed. 1302 (1931) (Hughes, C. J., dissenting)." 401 U.S. at 452–53, 91 S.Ct. at 837. The Court further stated:

> The point is that these affirmative purposes are neutral in the sense of the Establishment Clause. Quite apart from the question whether the Free Exercise Clause might require some sort of exemption, it is hardly impermissible for Congress to attempt to accommodate free exercise values, in line with "our happy tradition" of "avoiding unnecessary clashes with the dictates of conscience." United States v. Macintosh, *supra*, 283 U.S. at 634, 51 S.Ct. at 578 (Hughes, C. J., dissenting). 401 U.S. at 453, 91 S.Ct. at 838.

Similarly, we think that pragmatic, neutral purposes underlie Regulation 1605 and § 2000e(j). Like the conscientious objector exemption, the reasonable accommodation rule reflects a legislative judgment that, as a practical matter, certain persons will not compromise their religious convictions and that they

should not be punished for the supremacy of conscience. Without considering the impact of the free exercise clause, the Court in *Gillette* found a valid secular purpose in the congressional desire to promote and to protect the sort of conscientious action thought to be important in a democratic society. We believe that similar considerations were implicit in the reasonable accommodation rule, which to that extent is sustained by a neutral legislative purpose.

Secondly, it is apparent to us that Regulation 1605 and § 2000e(j) have a primary effect that neither advances nor inhibits religion. In practice, the reasonable accommodation rule restrains employers from enforcing uniform work rules that, although facially neutral, discriminate in effect against employees holding certain religious convictions. Thus the rule guarantees job security except when accommodation of an employee's religious practices would impose an undue hardship upon the employer's business. Regulation 1605 and § 2000e(j) mandate no financial support, direct or indirect, for religious institutions, a factor we find significant in view of the traditional characterization of such governmental aid as one of the primary evils against which the establishment clause protects. *See* Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Walz v. Tax Comm'n, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

It cannot be denied that some religious institutions will derive incidental benefits from Regulation 1605 and § 2000e(j). For example, churches holding services on Saturdays may enjoy a somewhat larger attendance with a correspondingly fuller collection plate. Senator Randolph mentioned this possibility when speaking in favor of his amendment:

I say to the distinguished chairman of the Labor and Public Welfare Committee, who manages this bill, that there has been a partial refusal at times on the part of employers to hire or to continue in employment employees whose religious practices rigidly require them to abstain from work in the nature of hire on particular days. So there has been, because of understandable pressures, such as commitments of a family nature and otherwise, a dwindling of the membership of some of the religious organizations because of the situation to which I have just directed attention. 118 Cong.Rec. 705 (1972).

Senator Randolph also made reference to the concern of a particular pastor with respect to the problems caused by the failure of employers to adjust work schedules to fit the requirements of the faith of some of the workers. The statute and regulation are applicable to *all* members of *all* religious faiths who observe Saturday as the Sabbath. We conclude that the argument of one Senator that the proposed legislation would assist a particular pastor and religious group does not require the conclusion that Congress enacted the legislation to promote and support a particular religion.

The Supreme Court has made it clear that a law is not necessarily unconstitutional merely because it confers incidental or indirect benefits upon religious institutions. Committee for Public Education v. Nyquist, 413 U.S. 756, 771–72, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). In our view, the primary effect of Regulation 1605 and § 2000e(j) is to inhibit discrimination, not to advance religion.

Nor do we believe that Regulation 1605 and § 2000e(j) raise the spectre of excessive government entanglement with religion. Surely the reasonable accommodation requirement will not subject religious institutions to the sort of "comprehensive, discriminating, and continuing [governmental] surveillance" that the Supreme Court found impermissible in Lemon v. Kurtzman, 403 U.S. 602, 619, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). By contrast, Regulation 1605 and § 2000e(j) require little or no contact between religious institutions and governmental entities. For the most part, the EEOC and the courts will have to determine simply whether the employer has made a reasonable accommodation

and whether an undue hardship will result. These issues will be considered in the labor relations context, and their resolution certainly does not necessitate any government entanglement with religion.

Appellee suggests, however, that EEOC investigators will be forced to study and to evaluate the dogma of the many religious sects in order to ascertain whether employees' practices and observances are genuinely religious and therefore protected under Title VII. In most cases, this issue probably will not be disputed seriously. To the extent that the question does arise, however, we think that it will require no more government involvement in religion than the concededly nonexcessive entanglement that occurs when a state must determine whether a purported church qualifies for a property tax exemption. *See* Walz v. Tax Comm'n, 397 U.S. 664, 674–76, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *id.* at 698–99, 90 S.Ct. 1409 (opinion of Harlan, J.).

Although the foregoing discussion disposes of Appellee's first amendment contention, we think our decision here gains additional support from a group of Supreme Court cases upholding various state Sunday closing laws. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Two Guys v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961); Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); Gallagher v. Crown Kosher Super Market, 366 U.S. 617, 81 S.Ct. 1122, 6 L.Ed.2d 536 (1961). In these cases the Court rejected establishment clause challenges, concluding that over the years the laws in question had evolved from their religious origins and had come to take on a secular character. The Court held that the statutes' present purpose and effect was not to aid religion but to set aside a uniform day of rest and recreation.

Sunday closing laws have the effect of forcing employers, even unwilling ones, to shut down operations on Sundays, thereby accommodating, at least coincidentally, the religious needs of the dominant Christian population. By contrast, § 2000e(j) requires only a reasonable accommodation of employees' religious practices, and only if that can be accomplished without undue hardship on the employer's business. Surely this constitutes a lesser interference with the rights of the employer than does a law requiring the employer to close his business entirely. Moreover, we are unable to perceive any greater tendency toward the establishment of religion in § 2000e(j) than in the Sunday closing laws. Thus we believe the result reached here is supported, if not compelled, by *McGowan* and its companion cases.

In summary, we hold that the reasonable accommodation rule is not inconsistent with the establishment clause of the first amendment. Accordingly, we find no constitutional basis for sustaining the District Court's decision. Since we have concluded that Appellant was the victim of religious discrimination within the meaning of Title VII, we must remand the case for a determination of the appropriate relief. At this point we simply note that the District Court should consider reinstatement, back pay, and attorney's fees. *See* 42 U.S.C. §§ 2000e–5(g), 2000e–5(k).

The judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.

Costs are taxed against Parker Seal Company.

CELEBREZZE, Circuit Judge (dissenting).

I respectfully dissent. The Bill of Rights, which contains the First Amendment, has endured because the federal judiciary has refused to cut constitutional corners to achieve temporary solutions to immediate problems. The majority departs from this tradition today, without thought to the damage that may be done to future generations.

What the majority fails to grasp is that if Congress is permitted to breach

the First Amendment by granting benefits to religion, it is thereby empowered to breach it to take away religious freedoms. In adopting the Bill of Rights the Framers were exceedingly careful to require of Government a neutral position in religious affairs, declaring religious freedom and denying special privileges to one religious group to the detriment of others. The majority, by judicial fiat, revises the Constitution, bypassing the ratification process. To follow the course advocated by the majority would mean approving a breach of the wall of separation between Church and State erected by the First Amendment. In time, as the breach grows, it could lead to political tyranny, with religious groups advancing their particular interests through our political institutions. I cannot concur in this departure from the neutral position to which Government is assigned under our form of political life.

Neutrality is the heart of the religion clauses of the First Amendment. The Supreme Court has steadfastly upheld Jefferson's injunction that Government remain neutral in religious affairs, with the First Amendment standing as "a wall of separation between Church and State." McCollum v. Board of Education, 333 U.S. 203, 211, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948); Everson v. Board of Education, 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Reynolds v. United States, 98 U.S. 145, 164, 25 L.Ed. 244 (1878).[1] The wall must protect against friendly assistance as well as hostile assaults, so that religion and government remain free from the sustenance and interference of one another. *See* Committee for Public Education v. Nyquist, 413 U.S. 756, 788–89, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); Everson v. Board of Education, 330 U.S. 1, 53, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (Rutledge, J., dissenting). This principle "forbids subtle departures from neutrality, 'religious gerrymanders,' as well as obvious abuses." Gillette v. United States, 401 U.S. 437, 452, 91 S.Ct. 828, 837, 28 L.Ed.2d 168 (1971).

By Regulation 1605.1 and by 42 U.S.C. § 2000e(j), the Federal Government has breached the wall. The Regulation and Section 2000e(j) grant preferences to employees by reason of their religion, forcing modifications in seniority systems, overtime scheduling, and other forms of employee organization. An employee is exempted from work on Saturdays if he demands release for religious purposes, but other employees are not accorded the same treatment if they prefer not to work on Saturdays. Not only are the latter employees not exempted, but they may have to substitute for the absent religious practitioner on Saturdays or lose their jobs.

Exemption from uniform work rules for religious reasons has been recognized as an unfair and undue preference under collective bargaining agreements. *See, e. g.,* John Morrell & Co., 17 Lab.Arb. 280, 282 (1951); Singer Co., 48 Lab.Arb. 1343 (1967). Judicial decisions not directly involving Regulation 1605.1 or Section 2000e(j) have underscored the inequity of a special rule for certain employees on religious grounds. *See, e. g.,* Dawson v. Mizell, 325 F.Supp. 511 (E.D. Va.1971); Eastern Greyhound Lines Division v. New York State Division of Human Rights, 27 N.Y.2d 279, 317 N.Y. S.2d 322, 265 N.E.2d 745, aff'g 34 A.D.2d 916, 311 N.Y.S.2d 465 (1970); Andrews v. O'Grady, 44 Misc.2d 28, 252 N.Y.S.2d 814 (1964); Otten v. Baltimore & O. R.R., 205 F.2d 58 (2d Cir. 1953). *See also* Hammond v. United Paperworkers Union, 462 F.2d 174 (6th Cir.), cert. denied, 409 U.S. 1028, 93 S.Ct. 464, 34 L.Ed.2d 322 (1972); Dewey v. Reynolds Metals Co., 429 F.2d 324 (6th Cir. 1970), aff'd by equally divided court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971).

Granting special privileges because of the exercise of one's religion is just as wrong as denying employment opportu-

---

1. Padover, The Complete Jefferson 518–19 (1943). *See* Kurland, "Of Church and State and the Supreme Court." 29 U.Chi.L.Rev. 1, 96 (1962).

nity because of one's religious beliefs. When Government engages in either practice, it discriminates on the basis of religion and abandons its neutrality.

As the majority points out, any rule must surmount three hurdles before it can be approved under the Establishment Clause. As the Supreme Court stated in Committee for Public Education v. Nyquist, 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973):

> [T]o pass muster under the Establishment Clause the law in question first must reflect a clearly secular legislative purpose [citation omitted], second, must have a primary effect that neither advances nor inhibits religion [citations omitted], and, third, must avoid excessive government entanglement with religion.[2]

I believe that the rule meets neither of the first two requirements under *Nyquist.*

The majority finds two "secular" purposes in the rule. First, it asserts that the rule is meant "to put teeth in the existing prohibition of religious discrimination." Second, it reasons that "the reasonable accommodation rule reflects a legislative judgment that, as a practical matter, certain persons will not compromise their religious convictions and that they should not be punished for the supremacy of conscience." Neither of these rationales justifies the rule.

There is no doubt that Congress acted with a valid secular purpose in banning employment discrimination based on religion through Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e, et seq. The expressed purpose of that legislation was to end discrimination based on certain factors that had no relation to an individual's ability and initiative and, accordingly, to end the burden on interstate commerce imposed by various forms of invidious discrimination.[3] The object was to make religion a meaningless factor in employment decisions.

This secular purpose does not justify the 1972 religious accommodation amendment, which incorporated EEOC Regulation 1605.1 into Title VII. Section 2000e(j) defines religion so as to require that persons receive preferential treatment because of their religion. This contradicts the secular purpose behind the original Title VII. Rather than "putting teeth" into the Act, it mandates religious discrimination, thus departing from the Act's basic purpose. *See* Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

The second purportedly secular justification for the rule is that it recognizes that "certain persons will not compromise their religious convictions" and ensures "that they will not be punished for the supremacy of conscience."

The absence of a religious accommodation rule, however, would not amount to punishment. It would simply be a "hands-off" attitude on government's part, allowing employers and employees to settle their own differences. The rule grants benefits to religious practitioners because of their religion. The second rationale the majority advances, therefore, amounts to an assertion that it is a valid secular purpose to grant preferences to persons whose religious practices do not fit prevailing patterns. Indeed, the legislative history of the 1972 amendment reveals Congressional thinking that the Establishment Clause was not violated because "[i]n dealing with the free exercise [of religion], really, this promotes the constitutional demand in that respect."[4]

It is, of course, fundamental that the First Amendment protects the free exercise of all religions, whatever the number of their practitioners. "A way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different." Wisconsin v. Yoder, 406 U.S. 205, 224, 92 S.Ct. 1526, 1537, 32 L.Ed.2d

---

2. *See also* Lemon v. Kurtzman, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Gillette v. United States, 401 U.S. 437, 450, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971).

3. 110 Cong.Rec. 1521–28 (1964).

4. Remarks of Sen. Williams, 118 Cong.Rec. 706 (1972).

15 (1972). Thus, Government may not penalize persons on the basis of their religion.

The Free Exercise Clause requires, for example, that when Government distributes unemployment benefits, it not withhold them from persons who refuse to work on Saturday because of their religious beliefs but are willing to take jobs which do not require Saturday work, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The holding in *Sherbert* "reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall." 374 U.S. at 409, 83 S.Ct. at 1797. *Sherbert* means that Government may not grant benefits to a uniform class of persons but exclude certain people "because of their faith, or lack of it." *Sherbert,* 374 U.S. at 410, 83 S.Ct. at 1797, *citing* Everson v. Board of Education, 330 U.S. 1, 16, 67 S.Ct. 504, 91 L.Ed. 711 (1947). *See also* Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *But cf.* Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878).

The fact that Government may not penalize particular religions[5] does not mean that Congress may favor particular religions. On the contrary, it means that Congress may not. The argument that aid to religious institutions is justified under a broad reading of the Free Exercise Clause has been raised on behalf of aid to parochial schools and other benefits to religious groups. *See* Lemon v. Kurtzman, 403 U.S. 602, 665, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (White, J., dissenting); Welsh v. United States, 398 U.S. 333, 367, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) (White, J., dissenting); Abington School District v. Schempp, 374 U.S. 203, 308, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Stewart, J., dissenting).[6] The argument has appeared in dissenting opinions, and Supreme Court majorities have consistently rejected it. In Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), for example, where use of the public schools for religious services during school hours was declared unconstitutional, respondents had urged that the First Amendment was "intended to forbid only government preference of one religion over another, not an impartial governmental assistance of all religions." 333 U.S. at 211, 68 S.Ct. at 465. Their argument was rejected because government aid to all religions "is not separation of Church and State." 333 U.S. at 212, 68 S.Ct. at 466. *McCollum's* reasoning has been reaffirmed repeatedly, Torcaso v. Watkins, 367 U.S. 488, 494, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); Zorach v. Clauson, 343 U.S. 306, 315, 72 S.Ct. 679, 96 L.Ed. 954 (1952).[7] The Free Exercise Clause provides a shield against government interference with religion, but it does not offer a sword to cut through the strictures of the Establishment Clause. The "secular purposes" advanced by the majority are nothing more than reiterations of justifications rejected in *McCollum, Lemon,* and *Torca-*

---

5. The current test is that Government establish a "compelling state interest" to overcome a showing of "undue burden" on the free exercise of a particular religion. *Sherbert, supra*; Wisconsin v. Yoder, *supra.*

6. *See* Schwarz, "No Imposition of Religion: The Establishment Clause Value," 77 Yale L.J. 692 (1968).

7. *Zorach* held that a public school system does not violate the Establishment Clause by allowing pupils "released time" for religious instruction outside school building and grounds during what would otherwise be "school time." *Zorach* explicitly reaffirmed *McCollum,* 343 U.S. at 315, 72 S.Ct. at 684, stating, "The government must be neutral when it comes to competition between sects." *Zorach's* holding that government "can close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction," 343 U.S. at 314, 72 S.Ct. at 684, does not control this case. Here Government has *required* employers to accommodate to their employees' religious practices.

*so.* There is no valid secular legislative purpose behind the rule. Its purpose is to protect and advance particular religions.

This purpose is clearly evident in the remarks of Senator Randolph, who authored the 1972 amendment. Although the majority cites his argument that the amendment would advance freedom from religious discrimination (despite its requiring discrimination on religious grounds), the majority fails to quote the real reason why Senator Randolph introduced the amendment:

> I say to the distinguished chairman of the Labor and Public Welfare Committee, who manages this bill, that there has been a partial refusal at times on the part of employees whose religious practices rigidly require them to abstain from work in the nature of hire on particular days. So there has been, because of understandable pressures, such as commitments of a family nature and otherwise, a dwindling of the membership of some of the religious organizations because of the situation to which I have just directed attention.
>
> My own pastor in this area, Rev. Delmer Van Horne, has expressed his concern and distress that there are certain faiths that are having a very difficult time, especially with the younger people, and understandably so, with reference to a possible inability of employers on some occasions to adjust work schedules to fit the requirements of the faith of some of their workers.[8]

The purpose evident in these remarks is the promotion of certain religions whose followers' practices conflict with employers' schedules. The promotion of a particular religion is not a justifiable ground for legislation. Otherwise, the neutrality principle, which is the core of the First Amendment, would be violated.

Not only does the religious accommodation rule lack a secular purpose. It also fails the second test under *Nyquist.* It lacks "a primary effect that neither advances nor inhibits religion," 413 U.S. at 773, 93 S.Ct. at 2965. It is, in other words, neither "even-handed in operation" nor "neutral in primary impact," *Gillette,* 401 U.S. at 450, 91 S.Ct. 828. *Accord* Everson v. Board of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The religious accommodation rule violates these principles in two respects.

First, the religious accommodation requirement discriminates between religion and non-religion. Only those with "religious practices" may benefit from the rule. Others are forced to submit to uniform work rules and to bear the burdens imposed by their employers' accommodation to religious practitioners. Thus, the rule discriminates against those with no religion, although the freedom not to believe is within the First Amendment's protection. Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); Board of Education v. Barnette, 319 U.S. 624, 641, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

Second, it discriminates among religions. Only those which require their followers to manifest their belief in acts requiring modification of an employer's work rules benefit, while other employees are inconvenienced by the employer's accommodation. By singling out particular sects for government protection, the Federal Government has forfeited the pretense that the rule is merely part of the general ban on religious discrimination. "The government must be neutral when it comes to competition between sects." Zorach v. Clauson, 343 U.S. 306, 315, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952).[9] It has not been neutral here.

In two respects, then, the religious accommodation rule is neither "neutral in

---

**8.** 118 Cong.Rec. 705 (1972). Although arguments made on behalf of legislation do not condemn it if a valid purpose exists, legislative history is one guide to discerning the purpose of legislation. McGowan v. Maryland, 366

U.S. 420, 453, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

**9.** *See also* Everson v. Board of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

primary impact" nor "evenhanded in operation." Unlike the exemption from the draft laws for those conscientiously opposed to all war upheld in *Gillette*, the preference here is extended on the explicit basis of "religious practices" under the Regulation and "all aspects of religious observance and practice, as well as belief" under the 1972 amendment. The primary, indeed the sole, impact of the rule is to aid particular persons on the basis of their religion. Thus, it is incorrect to say, as does the majority, that the primary effect of the rule "is to inhibit discrimination, not to advance religion." The rule mandates discrimination on the explicit basis of religion. Its primary effect is to aid particular religious sects.

Accordingly, the religious accommodation requirement violates the First Amendment. As we stated recently in Daniel v. Waters, 515 F.2d 485, 490 (6th Cir. 1975), citing Epperson v. Arkansas, 393 U.S. 97, 103–40, 89 S.Ct. 266, 21 L.Ed.2d 228:

> Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.

> As early as 1872, this Court said: "The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." Watson v. Jones, 13 Wall. 679, 728, 20 L.Ed. 666. This has been the interpretation of the great First Amendment which this Court has applied in the many and subtle problems which the ferment of our national life has presented for de-

cision within the Amendment's broad command.

Because the religious accommodation rule violates the First Amendment under the first two tests of *Nyquist*, it is unnecessary to consider whether it also fosters "excessive entanglement" of Church and State. Lemon v. Kurtzman, 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Walz v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). It is fair to note, however, that the 1972 amendment is worded far more broadly than Regulation 1605.1. The 1972 amendment extends to "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). It therefore protects employees who object on religious grounds to making particular products (e. g., a religious pacifist's refusal to make ammunition), to shaving (e. g., Eastern Greyhound Lines Division v. New York State Division of Human Rights, 27 N.Y.2d 279, 317 N.Y.S.2d 322, 265 N.E.2d 745 (1970)), to joining a union in a closed shop (e. g., Gray v. Gulf, Mobile & Ohio R.R., 429 F.2d 1064 (5th Cir. 1970), cert. denied, 400 U.S. 1001, 91 S.Ct. 461, 27 L.Ed.2d 451 (1971)), and to doing a host of other things often required of employees by employers.[10] Disposition of complaints under the amendment will require inquiry into the sincerity with which beliefs are held and force consideration of the validity of the religious nature of claims, procedures which are not favored and may themselves be improper because they put courts in review of religious matters.[11]

Striking down the religious accommodation rule would not change the law requiring employers to disregard religion in employment decisions. Discrimination based on religion is illegal. If a Saturday Sabbath observer can show that an employer discharged him for refusing to work on Saturdays although similarly

---

**10.** *See generally* Comment, "Religious Observance and Discrimination in Employment," 22 Syr.L.Rev. 1019 (1971).

**11.** *See* United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); Founding

Church of Scientology v. United States, 133 U.S.App.D.C. 229, 409 F.2d 1146 (1969); Wisconsin v. Yoder, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

situated employees were not required to work on Saturdays or were exempted from Sunday work, he could maintain that the actual reason for his discharge was religious discrimination, not his refusal to work on Saturdays. *Cf.* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Long v. Ford Motor Co., 496 F.2d 500 (6th Cir. 1974). Similarly situated employees must be treated equally. Striking down the accommodation requirement would merely ensure that no employee be treated preferentially because of his religion.

It may be asked whether striking down the religious accommodation rule would deprive our nation of a rich diversity of religious practices by allowing prevailing employment policies to force persons into predominant patterns of religious observance.

Our heritage has not withered because of the constitutional requirement that Government keep "hands off" religion. The heavy hands of Government may not be raised against or in favor of religion. As Judge Learned Hand wrote,

> The First Amendment protects one against action by the government, though even then, not in all circumstances [footnote omitted]; but it gives no one the right to insist that in the pursuit of their own interests others must conform their conduct to his own religious necessities. A man might find it incompatible with this conscience to live in a city in which open saloons were licensed; yet he would have no constitutional right to insist that the saloons must be closed. He would have to leave the city or put up with the *iniquitous dens*, no matter what economic loss his change of domicil entailed. We must accommodate our idiosyncrasies, religious as well as secular, to the compromises necessary in communal life; and we can hope for no reward for the sacrifices this may require beyond our satisfaction from within, or our expectations of a better world.[12]

This is not to say that a wise employer could not decide that as a matter of sound business practice and good employee relations to accommodate to his employees' religious practices. Forbidding the government from *requiring* accommodation would not be a holding that accommodation may not be made by private or public employers. There must be room to maneuver between the Free Exercise and the Establishment Clauses. This space is properly filled by the employer's discretion. *Cf.* Stein v. Oshinsky, 348 F.2d 999 (2d Cir. 1965). Striking down the accommodation requirement would merely serve to permit this range of discretion.

Like the majority, I believe that religious discrimination in employment must end. Title VII says that it must and promises that it will. In pursuit of this objective, I cannot condone a rule that mandates discrimination on the basis of religion. This rule breaches the neutrality principle which is at the heart of the First Amendment. Mindful of my obligation to preserve the Bill of Rights, I respectfully dissent.

---

**12.** Otten v. Baltimore & O. R.R., 205 F.2d 58, 61 (2d Cir. 1953).