The CATHOLIC BISHOP OF CHICAGO, a corporation sole, Petitioner,

v.

The NATIONAL LABOR RELATIONS BOARD, Respondent,

and

The Illinois Education Association, Intervenor.

DIOCESE OF FORT WAYNE–SOUTH BEND, INC., Petitioner,

v.

The NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 76–1600, 76–1638.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1977.

Decided Aug. 3, 1977.

---

Samuel Edes, Chicago, Ill., for intervenor.

Elliott Moore, John C. Rother, John D. Burgoyne, N.L.R.B., Washington, D.C., for respondent.

Before CUMMINGS, PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

The First Amendment to the Constitution of the United States specifies that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. The cases before us present the issue of whether this constitutional prohibition (sometimes called a high and impregnable wall,[1] but more recently characterized as being a blurred, indistinct, variable barrier depending on all the circumstances of a particular relationship[2]) serves to prevent the National Labor Relations Board, which functions pursuant to an Act of Congress, from exercising jurisdiction over two groups of secondary diocesan schools operated by the Roman Catholic Church.

On June 12, 1974, the Quigley Education Association, an affiliate of the Illinois Education Association, intervenor herein, filed a representation petition with the Board seeking to represent a bargaining unit composed of lay teachers employed at Quigley Seminary North and Quigley Seminary South, secondary schools located in the City of Chicago and operated by The Catholic Bishop of Chicago, a corporation sole, one of the employers[3] herein. On June 4, 1975, the Community Alliance, the other union here involved, filed a representation peti-

Don H. Reuben, Chicago, Ill., Jerome J. O'Dowd, Fort Wayne, Ind., for petitioner.

1. *Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

2. *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

3. Throughout this opinion we shall generally use the terms employers and bishops interchangeably. Under Canon Law, the bishops are technically known as Ordinaries. Under the laws of Illinois and Indiana, there are some differences in the way in which the bishops have organized their dioceses for purposes of adhering to the neutral and secular requirements of state law. By the Act of February 20, 1861, the General Assembly of Illinois transformed the then Catholic Bishop of Chicago, and his successors in office, into a body politic, and a corporation sole, under the name and style of "The Catholic Bishop of Chicago." In Indiana, the bishop operates the diocese through a not-for-profit corporation. For the purposes of this opinion, we will not incorporate distinctions between the corporate entities and the persons of the Ordinaries.

tion with the Board seeking to represent a bargaining unit composed of lay teachers employed at five diocesan high schools,[4] operated by the Diocese of Fort Wayne-South Bend, Inc., one of the employers, in Northeastern Indiana.[5]

█ In the representation hearings conducted during 1975, the employers contended, *inter alia*, that the Board should decline jurisdiction under its own jurisdictional criteria, and that in any event the First Amendment prohibited the Board's taking jurisdiction of these schools. The employers' jurisdictional arguments were rejected on the basis of the Board's decisions in *Roman Catholic Archdiocese of Baltimore, Archdiocesan High Schools*, 216 NLRB 249 (1975); and *Cardinal Timothy Manning, Roman Catholic Archbishop of the Archdiocese of Los Angeles, a Corporation Sole, Etc.*, 223 NLRB 1218 (1976). Elections were ordered in one unit of all the lay faculty at the two Quigley schools[6] and one unit of the five Indiana diocesan high schools. The unions won the elections and were certified by the Board as the exclusive representatives of the lay faculties in the units.

Following the unions' requests to bargain collectively, the employers refused to bargain in order to obtain judicial review of the Board's representation decisions. The unions then filed unfair labor practice charges with the Board, and complaints issued charging the employers with refusing to bargain with the unions in violation of Sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) and (1). Motions for summary judgment in both cases were filed with the Board. In response, both employers admitted that they continued to refuse to bargain collectively with the lay teachers and raised again the affirmative defense that the Board had no jurisdiction over the seminary high schools and the five diocesan high schools.

The Board granted the motions for summary judgment and held that the employers had violated Sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) and (1), by refusing to bargain with the certified bar-

---

4. All church operated schools, at least through the secondary level, are frequently generically referred to by the public as parochial schools. Technically, parochial schools would appear to be those established by the parish and the high schools such as those involved in the present cases would be properly characterized as diocesan institutions. *See* T. Bouscaren and A. Ellis, Canon Law: A Text and Commentary 746 (3d rev.ed. 1957). Nevertheless, noting that Webster's Third International Dictionary gives a gloss to the popular usage by defining "parochial school" as "[a] school maintained by a religious body usually for elementary instruction," and because of reference herein to the so-called *parochaid* cases, we, on occasion, will use the publicly understood reference.

5. If the religious saturation of the Chicago schools as opposed to the Indiana schools should be significant, it appears clear on the records before us, and apparently is not disputed, that the Quigley schools had a higher degree of religious orientation than did the Indiana schools. The *intervening union does not* deny that to be admitted to the Quigley schools a boy must receive a recommendation from his parish priest stating that the boy has some interest in the priesthood or has the character and ability to give the local pastor reason to think he has the potential for Christian leadership, either as a priest or a layman. This is a change from former years as prior to 1970 only boys who had a positive desire to be priests were admitted to the Quigley schools. On the other hand, the Indiana schools are typical of so-called parochial high schools found throughout this country maintained and operated by the Roman Catholic Church. Because of the result we reach in these cases with regard to the Indiana schools, we do not deem it necessary to give significance to the apparently greater religiosity of the Quigley schools.

6. The brief for the Chicago employer complains of mystification that the Board found 46 laymen and a mere $65,500 in interstate purchases as posing a threat to interstate commerce of the type that the National Labor Relations Act was intended to meet. It was also pointed out by this employer that it was necessary for the operating budgets for the two Quigley schools to be totalled together as the Board did to meet the Board's jurisdictional standard for private educational institutions as contained in 29 C.F.R., Part 103, Subpart A, § 103.1 (1970), of $1,000,000. We note, however, that the Act authorizes the Board to decide in each case the appropriate unit and whether that should be the employer unit or some other type, 29 U.S.C. § 159(b). Here the Board was within its statutory authority of selecting an employer unit. The Chicago employer's brief has not pursued the matter and we shall likewise refrain from further pursuit.

gaining representatives of their employees. In reaching these decisions, the Board rejected the employers' constitutional contentions on the basis that

(1) the purpose of the Act is to maintain and facilitate the free flow of commerce through the stabilization of labor relations; (2) the provisions of the Act do not interfere with religious beliefs; and (3) regulation of labor relations does not violate the first amendment when it involves a minimal intrusion on religious conduct and is necessary to obtain that objective.

The Board's orders require the employers to desist from the unfair labor practices found and from interfering with their employees' rights under Section 7 of the Act, 29 U.S.C. § 157. Affirmatively, the Board's orders require the employers to bargain with the unions upon request and to post appropriate notices.

The Board's Decisions and Orders issued on June 18, 1976, and are reported at 224 NLRB No. 164 (1976); and at 224 NLRB No. 165 (1976). The respective church employers have petitioned this court to review and set aside the orders and the Board has cross-applied for enforcement of its orders. This court has jurisdiction in the proceedings under Sections 10(e) and (f) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 160(e) and (f).

On the day that oral argument was heard in the present cases, argument was also heard with regard to the attempted exercise of jurisdiction by the Board over parochial schools in another diocese in Indiana. In that case the bishop had not gone through the Board procedures as in the present cases. The district court in the third case had granted an injunction as to the continuance of the Board proceedings and as to an unfair labor practice charge arising out of a discharge during the representation effort. This court acting through the same panel as in the present cases, in an opinion written by Judge Cummings, unanimously agreed that the district court had no jurisdiction because the status quo in the case did not impede the free exercise of

religious belief inasmuch as if the union should win the election and be certified by the Board, the bishop-plaintiff could refuse to bargain with the union and test the validity of the Board's jurisdiction in this court. "Any First Amendment challenge may later be presented in this Court." *Grutka v. Barbour,* 549 F.2d 5, 10 (7th Cir. 1977), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977). *But cf. Caulfield v. Hirsch,* 46 U.S.L.W. 2025 (E.D.Pa. July 7, 1977).

The Board, now that the administrative procedures which were not followed in *Grutka* have been followed here, takes the position primarily that there is no First Amendment infringement in the Board's exercise of jurisdiction but secondarily that, even if there conceivably could be a problem "down the line," any such problem would have to be litigated later and "the Board would be compelled to try to make some reasonable accommodation to the religious purposes of the school."

■ To put the present cases into perspective, we will survey briefly the developments which have resulted in the present purported exercise of jurisdiction by the Board. The irreptitious process of bringing private educational institutions within the ambit of the National Labor Relations Act commenced in 1970. In *Cornell University,* 183 NLRB 329 (1970), the Board, ending a long time refusal to assert jurisdiction over non-profit educational institutions as a class, stated that it would no longer decline to assert such jurisdiction. This history was reviewed with regard to another private nonprofit institution of higher education by the First Circuit in *NLRB v. Wentworth Institute,* 515 F.2d 550 (1st Cir. 1975). That court rejected the argument that such educational institutions must be impliedly excluded either because of the Act's legislative history or the Board's earlier policy and held instead that the Act, clear on its face, could not be understood to preclude jurisdiction. We accept *Wentworth* as established law in this respect.[7]

7. It would seem beyond any reasonable likelihood that the founding fathers in granting in

Article I, Section 8 of the Constitution the power to Congress to regulate commerce among

Nevertheless, the Board declined to extend this phase of its recently enlarged jurisdiction to schools found to be "completely religious" and hence declined jurisdiction, where the schools were devoted exclusively to teaching religion or religious subjects. *See, e. g., Association of Hebrew Teachers of Metropolitan Detroit,* 210 NLRB 1053, 1058 (1974); *Board of Jewish Education of Greater Washington, D.C.,* 210 NLRB 1037 (1974). In the following year, however, the Board refined its standard of jurisdiction and accepted jurisdiction where the instruction was not limited to religious subjects and religiously associated schools sought to provide a general education, albeit an education based on religious principles. *Roman Catholic Archdiocese of Baltimore, Archdiocesan High Schools, supra.*

The Board's position with regard to schools at least of the type of those found in the diocese of Fort Wayne-South Bend is set forth in its 1976 *Los Angeles* case, *supra,* 223 NLRB at 1218, as follows:

> We also do not agree that the schools are religious institutions intimately involved with the Catholic Church. It has heretofore been the Board's policy to decline jurisdiction over institutions only when they are completely religious, not just religiously associated. *Roman Catholic Archdiocese of Baltimore, Archdiocesan High Schools,* 216 NLRB 249 (1975). The schools perform in part the secular

function of educating children, and in part concern themselves with religious instruction. Therefore, we will not decline to assert jurisdiction over these schools on such a basis. *Roman Catholic Archdiocese of Baltimore, Archdiocesan High Schools, supra.*

The procedural route followed in the two cases before us varied somewhat, but the result reached was identical in that the constitutional claims were rejected. In case No. 76–1600, the representation petition had originally been dismissed without a hearing by the Acting Regional Director on the basis of *Board of Jewish Education.* The petitioning union filed an administrative appeal, and the Board reinstated the petition and directed the Regional Director to proceed with a hearing. After the hearing, by direction of the Regional Director the proceeding was transferred to the Board for decision. In response to the employer's contention that the schools involved were minor seminary schools operated independently of each other and beyond the Board's purview and that assertion of jurisdiction would constitute an impermissible entanglement between State and Church, the Board citing *Baltimore* stated that its policy was to decline jurisdiction over religiously sponsored organizations only when they are completely religious, not just religiously associated. The Board concluded by

---

the several states could have had in mind that any Act of Congress controlling the relations between teachers and the proprietors of a private local secondary school would be justified under the commerce power provision. One calls to mind the attitude in a somewhat analogous situation found in *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), and Daniel Webster's oral argument referring to the small college "and yet there are those who love it," in which argument he also said in a passage which the founding fathers might have deemed applicable to the cases before us:

> The case before the court is not of ordinary importance, nor of every-day occurrence. It affects not this college only, but every college, and all the literary institutions of the country. They have flourished, hitherto, and have become in a high degree respectable and useful to the community. They have all

a common principle of existence, the inviolability of their charters. It will be a dangerous, a most dangerous, experiment, to hold these institutions subject to the rise and fall of popular parties, and the fluctuation of political opinions. If the franchise may be, at any time, taken away or impaired, the property also may be taken away, or its use perverted.

*Id.* at 598–99.

Nevertheless, and being not unmindful that recognition of the scope of the commerce power clause has long since passed the comprehension of the founding fathers, we accept the applicability of the clause to private schools, provided, of course, that its exercise does not run afoul of the First Amendment constitutional protection. *See generally Wisconsin v. Yoder,* 406 U.S. 205, 213–15, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

finding no merit in the contentions that the two schools involved were minor seminary schools and therefore "completely religious." In analyzing the record produced at the hearing the Board noted that the Archbishop's policy reflected the desires of the Church to admit those who might adopt the vocation of the priesthood but that in reality the two Quigley schools operated primarily as college preparatory schools "within the class over which the Board has heretofore asserted jurisdiction." Noting that of the 1974 graduating classes only 16% went to the diocesan seminary college, that the academic curriculum was similar to that of other high schools, both private and public, and that the schools maintained a substantial number of extracurricular activities including interschool sports and intramural activities similar to those engaged in by students in other high schools, the Board stated that under these circumstances the Quigley schools, while religiously associated, "are not completely religious," and are the type over which the Board asserted jurisdiction.

When the unfair labor practice case later came before the Board, summary judgment was granted essentially on the basis that nothing was presented which would require the Board to reexamine the decision made in the representation proceeding. In answer to the employer's contention that summary judgment was inappropriate because the Board had never fully determined or addressed itself to the constitutional issues raised in the representation case, the Board responded that the constitutional contentions were clearly raised in the employer's extensive brief to the Board and that the Board's decision in ordering an election had made specific reference to the Church-State entanglement contention in finding "that the Quigley schools, while religiously associated, are not completely religious and of the type over which the Board has asserted jurisdiction." Further, the Board stated that it could not agree with the constitutional contention because of the principles set forth more fully in the *Los Angeles* case, *i. e.,* that the purpose of the Act is to maintain and facilitate the free flow of

commerce through the stabilization of labor relations, that the provisions of the Act do not interfere with religious beliefs, and that the regulation of labor relations does not violate the First Amendment "when it involves a minimal intrusion of religious conduct" and is necessary to obtain the objective of the Act.

In Case No. 76–1638, the original decision and direction of election was issued by the Acting Regional Director at Indianapolis, Indiana, and summarily disposed of the constitutional claim as follows: "The Employer's contentions that jurisdiction should not be asserted because of its religious character are rejected. *Archdiocese of Baltimore,* 216 NLRB No. 54." The Board's response thereafter was equally summary, as appears from the following teletype: "EMPLOYER REQUEST FOR REVIEW OF ACTING REGIONAL DIRECTOR'S DECISION AND DIRECTION OF ELECTION IS HEREBY DENIED AS IT RAISES NO SUBSTANTIAL ISSUES WARRANTING REVIEW. REQUEST FOR ORAL ARGUMENT IS ALSO DENIED."

When the unfair labor practice case came before the Board, the Board's order handed down the same day as the order in Case No. 76–1600 essentially followed the same pattern as previously discussed herein with regard to the Chicago case. Again reliance was placed on the tripartite statement of the principles of the *Los Angeles* case including the involvement of a minimal intrusion of religious conduct. There is, however, in the Board's order no express finding that the Fort Wayne-South Bend schools were not "completely religious." By virtue of the Acting Regional Director's reliance on *Baltimore* and the Board citation of *Los Angeles,* we may assume, however, that impliedly the Board found the diocesan high schools not to be "completely religious" and that the Board had not abandoned this standard.

The Board contends that it did not abuse its discretion in finding that under its standard the two Chicago minor seminaries and the five Indiana diocesan high schools were not "completely religious." It observes that

the employers do not appear to be questioning its declination of jurisdiction over "completely religious" schools but seem to contend that the Board misapplied the self-imposed jurisdictional standard. Thus, apart from its contention that there is no First Amendment bar to the application of the Act to Catholic schools, the Board argues that the record amply supports its findings. At the same time, however, the Board argues that this court should not review the Board's formulation of its jurisdictional standard in the absence of extraordinary circumstances such as unjust discrimination, citing, inter alia, NLRB v. Carroll-Naslund Disposal, Inc., 359 F.2d 779, 780 (9th Cir. 1966) ("The question is whether the Board has violated its own self-imposed jurisdictional standards. It is settled law that the extent to which the Board chooses to exercise its statutory jurisdiction is a matter of administrative policy within the Board's discretion . . . and is not a question for the courts . . . in the absence of extraordinary circumstances, such as unjust discrimination . . . .")

Because the core question before us is whether the Board's exercise of jurisdiction over the schools constitutes an improper breaching of the separation wall provided by the Religion Clauses of the First Amendment, we regard this issue, being as it is one which has caused frequent discussions in the Supreme Court in other contexts, as sufficiently extraordinary [8] to require us to analyze the Board's jurisdictional standard by examining it in the light of the cases dealing with the Religion Clauses.

We find the standard itself to be a simplistic black or white, purported rule containing no borderline demarcation of where "completely religious" takes over or, on the other hand, ceases. In our opinion the dichotomous "completely religious—merely religiously associated" standard provides no workable guide to the exercise of discretion. The determination that an institution is so completely a religious entity as to exclude any viable secular components obviously implicates very sensitive questions of faith and tradition. See, e. g., Yoder, supra, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15. At some point, factual inquiry by courts or agencies into such matters would almost necessarily raise First Amendment problems. If history demonstrates, as it does, that Roman Catholics founded an alternative school system for essentially religious reasons and continued to maintain them as an "integral part of the religious mission of the Catholic Church," Lemon, supra, 403 U.S. at 616, 91 S.Ct. at 2113, courts and agencies would be hard pressed to take official or judicial notice that these purposes were undermined or eviscerated by the determination to offer such secular subjects as mathematics, physics, chemistry, and English literature.

In our view the Board decisions dealing with the present question demonstrate that the Board has essentially adopted a per se rule [9] that Catholic secondary schools will be subject to its statutory jurisdiction. The simple truth is that the Board had defined those Catholic schools which offer the regular range of secondary subjects as being intrinsically incapable of meeting its jurisdictional standard of "completely religious."

Thus, in Baltimore, the Board noted the Archdiocese's contention that the Board should not assert its jurisdiction because of its religious character. Because the Arch-

---

**8.** Adjudication of the constitutionality of Congressional enactments has generally been thought beyond the jurisdiction of administrative agencies. Grutka, supra at 8. There is in the present cases no facial challenge to the statute under which the Board is proceeding but rather one to the application of the statute to certain parochial schools. The manner of application as we pointed out in Grutka required the development of a factual record, which has now been done.

**9.** The Board has apparently chosen, as it customarily does, to approach the issue of the jurisdictional standard for parochial secondary schools through case-by-case decision-making rather than by the use of its formal rule-making powers under Section 6 of the Act, 29 U.S.C. § 156. For a critique of this phase of the Board's procedures in another education field, see Kahn,. The NLRB and Higher Education: The Failure of Policy Making through Adjudication, 21 U.&.L.A. L.Rev. 63, 167 et seq. (1973).

diocese "concede[d] that instruction is not limited to religious subjects," the Board rejected the contention. Similarly, in *Los Angeles,* the Board could not agree "that the schools are religious institutions intimately involved with the Catholic Church," even though its decision formally recited that the twenty-six schools were owned and operated by the Archdiocese of Los Angeles. The rationale for rejecting the Cardinal's contention was that

> [t]he schools perform in part the secular function of educating children, and in part concern themselves with religious instruction. Therefore, we will not decline to assert jurisdiction over these schools on such a basis.

223 NLRB at 1218.

Under the rationale the Board has adopted, it is readily apparent that secondary schools operated by various dioceses of the Roman Catholic Church can never be characterized as "completely religious." Once the employer admits the fact that its schools are performing "in part the secular function of educating children," it becomes definitionally impossible under the Board's cases to establish that the institutions can be anything else but "merely religiously associated."

The vagaries of litigation seldom present a "no lose" situation. Yet the Board's formulation of the "misapplication of jurisdictional standards" argument does seem to present a quintessential example of one. Assuming that the amount of gross revenues suffices, institutions which the Supreme Court has generically labeled as "sectarian," "substantially religious," "pervasively sectarian," "church-affiliated," and "religion-pervasive institutions," *e. g., Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 748–54, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Meek v. Pittenger,* 421 U.S. 349, 366, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Levitt v. Committee for Public Edu-*

*cation,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); *Committee for Public Education v. Nyquist,* 413 U.S. 756, 767–68, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman, supra,* are definitionally transmuted into schools which are "merely religiously associated." [10] The total inability of the employers to overcome what appears to be an irrebuttable presumption in practical operation makes more understandable the complaint of the employers that the Board is cruelly whip-sawing their schools by holding that institutions too religious to receive governmental assistance are not religious enough to be excluded from its regulation.

Following the premise in the recent *Wolman* case, *id.* ——— U.S. at ———, 97 S.Ct. 2593, that irrespective of the height, breadth, straightness, or fissures in the Religion Clauses separation wall, the Court's numerous precedents in this area are firmly rooted and now provide substantial guidance, we turn to the teaching to be derived from those cases.

As an initial matter, while the so-called parochaid cases are concerned primarily with whether the flow of benefits from governmental sources to the church schools should be prohibited, an equally basic purpose of the Religion Clauses is also to see that no religion is inhibited. "[W]e will not tolerate either governmentally established religion or governmental interference with religion." *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970). As a result of the tension inevitably existing between the Free Exercise and the Establishment Clauses, "our cases require the State to maintain an attitude of 'neutrality,' neither 'advancing' nor 'inhibiting' religion." (Footnote omitted.) *Nyquist, supra,* 413 U.S. at 788, 93 S.Ct. at 2973.

We find particularly significant this statement in *Walz, supra,* 397 U.S. at 669, 90 S.Ct. at 1412:

10. The most recent case in the present area is that of *Wolman v. Walter,* —— U.S. ——, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), a case which some observers have interpreted as retreating somewhat from a staunch insistence on the separation of Church and State. We observe

nevertheless that the decision refers with regard to instructional materials and equipment to "the impossibility of separating the secular educational function from the sectarian . . . ." *Id.* at ——, 97 S.Ct. at 2607.

Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or *interfere with religious beliefs and practices or have the effect of doing so.* Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses has prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice. [Emphasis added.]

We find no basis in the present record for thinking that the Board has made any value judgments under the Religion Clauses as to whether their exercise of jurisdiction will have the *effect* of interfering with religious beliefs or practices. That the Board did not do so is no doubt a conscious consequence of the Board's realization that measuring the degree of religiosity in any particular institution would perforce involve it in answering the sensitive question as to how far religion pervades that institution. Avoiding the question, however, does not and cannot negative its continued existence, nor can a wooden adherence to a jurisdictional standard of "merely religiously associated" mean that simply because a school includes in its curriculum secular subjects it is thereby deprived of the protection of the Religion Clauses in its recognized pursuit of the propagation of its religious faith.[11]

Indeed, with regard to the matter of neutrality or noninterference, the position of the Court is a more positive one than mere neutrality but is a positive "hands off" stricture with respect to "the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976); *Presbyterian Church v. Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929); *Kreshik v. St. Nicholas Cathedral of the Russian Orthodox Church of North America*, 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960).

We have earlier herein collectively referred to some of the recent Supreme Court cases involving challenged state aid to parochial schools and pointed out in that connection that these institutions had been generically labeled in a manner which appeared to be inconsistent with a constitutional basis for differentiating between "completely religious" and "religiously associated." For further elaboration on that particular as-

---

11. While the Board purported to avoid an excursion into religiosity by the use of its simplistic test, the record in one of the cases reflects several cases of attention to strictly religious matters. There were several questions by counsel for the union on these subjects, and the following occurred in colloquy between the hearing officer and one of the employer's witnesses:

Q Now, we have had quite a bit of testimony already as to liturgies, and I don't want to beat a dead horse; but let me ask you one question: If you know, how many liturgies are required at Catholic parochial high schools; do you know?

A I think our first problem with that would be defining liturgies. That word would have many definitions. Do you want to go into that?

Q I believe you defined it before, is that correct, when you first testified?

A I am not sure. Let me try briefly to do it again, okay?

Q Yes.

A A liturgy can range anywhere from the strictest sense of the word, which is the sacrifice of the Mass in the Roman Catholic terminology. It can go from that all the way down to a very informal group in what we call shared prayer.
Two or three individuals praying together and reflecting their own reactions to a scriptural reading. All of these—and there is a big spectrum in between those two extremes—all of these are popularly referred to as liturgies.

Q I see.

A Now, possibly in repeating your question, you could give me an idea of that spectrum, I could respond more accurately.

Q Well, let us stick with the formal Masses. If you know how many Masses are required at Catholic parochial high schools?

pect of the present cases, we turn to language contained in two cases:

> On the basis of these findings the District Court concluded that the parochial schools constituted "an integral part of the religious mission of the Catholic Church." The various characteristics of the schools make them "a powerful vehicle for transmitting the Catholic faith to the next generation." This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the pupils, in primary schools particularly. In short, parochial schools involve substantial religious activity and purpose.
>
> The substantial religious character of these church-related schools gives rise to entangling church-state relationships of the kind the Religion Clauses sought to avoid. Although the District Court found that concern for religious values did not inevitably or necessarily intrude into the content of secular subjects, the considerable religious activities of these schools led the legislature to provide for careful governmental controls and surveillance by state authorities in order to ensure that state aid supports only secular education. [Footnote omitted.]

*Lemon, supra*, 403 U.S. at 616, 91 S.Ct. at 2113.

> Several teachers testified, however, that they did not inject religion into their secular classes. And the District Court found that religious values did not necessarily affect the content of the secular instruction. But what has been recounted suggests the potential if not actual hazards of this form of state aid. The teacher is employed by a religious organization, subject to the direction and discipline of religious authorities, and works in a system dedicated to rearing children in a particular faith. These controls are not lessened by the fact that most of the lay teachers are of the Catholic faith. Inevitably some of a teacher's responsibilities hover on the border between secular and religious orientation.
>
> We need not and do not assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment. We simply recognize that a dedicated religious person, teaching in a school affiliated with his or her faith and operated to inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral. Doctrines and faith are not inculcated or advanced by neutrals. With the best of intentions such a teacher would find it hard to make a total separation between secular teaching and religious doctrine. What would appear to some to be essential to good citizenship might well for others border on or constitute instruction in religion. Further difficulties are inherent in the combination of religious discipline and the possibility of disagreement between teacher and religious authorities over the meaning of the statutory restrictions.

*Id.* at 618–19, 91 S.Ct. at 2114.

Mr. Justice Douglas in his concurring opinion in *Lemon* graphically demonstrated the thorough religious permeation of the entire curriculum of parochial schools in the following language:

> Elimination of prayers is only part of the problem. The curriculum presents subtle and difficult problems. The constitutional mandate can in part be carried out by censoring the curricula. What is palpably a sectarian course can be marked for deletion. But the problem only starts there. Sectarian instruction, in which, of course, a State may not indulge, can take place in a course on Shakespeare or in one on mathematics. No matter what the curriculum offers, the question is, what is *taught*? We deal not with evil teachers, but with zealous ones who may use any opportunity to indoctrinate a class.
>
> It is well known that everything taught in most parochial schools is taught with the ultimate goal of religious education in mind. Rev. Joseph H. Fichter, S.J., stated in Parochial School: A Sociological Study 86 (1958):

"It is a commonplace observation that in the parochial school religion permeates the whole curriculum, and is not confined to a single half-hour period of the day. Even arithmetic can be used as an instrument of pious thoughts, as in the case of the teacher who gave this problem to her class: 'If it takes forty thousand priests and. a hundred and forty thousand sisters to care for forty million Catholics in the United States, how many more priests and sisters will be needed to convert and care for the hundred million non-Catholics in the United States?' " [12]

*Id.* at 634–35, 91 S.Ct. at 2122.

The Court restated its conclusions regarding the religious character of parochial schools in *Meek v. Pittenger, supra,* 421 U.S. at 365, 95 S.Ct. at 1763:

[I]t would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many of Pennsylvania's church-related elementary and secondary schools . . . . .

The Court, quoting from *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), referred to the schools as institutions "in which religion is so pervasive that a substantial portion of . . . [their] functions are subsumed in the religious mission . . . ." *Id.* 421 U.S. at 366, 95 S.Ct. at 1763.

The Court then explained: ·

The church-related elementary and secondary schools . . . typify such religion-pervasive institutions. The very purpose of many of those schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief. See *Lemon v. Kurtzman,* 403 U.S. at 616–17, [91 S.Ct. [2105] at 2113] . . . . .

"[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined."

*Id.* at 366, 95 S.Ct. at 1763.

The parochial schools in the cases before us are indistinguishable from those described in *Lemon* and *Meek* other than that the Quigley schools are even more completely religiously oriented. All of these essentially patricentric schools are completely subject to the authority of the respective bishops who have the general right of vigilance as to faith and morals and direct authority as regards religious instruction.[13] The bishops operate the schools through functionaries who are completely subservient to the bishops' authority. The purpose of the schools is to carry out the teaching mission of the Catholic Church. The teachers share in the ecclesiastical authority of the Bishop, and all teachers are expected to assist the students to become good Christians. The fact that these institutions provide a secular as well as a religious education does not detract from the fact that the religious mission "is the only reason for the schools' existence." *Meek, supra* at 366, 95 S.Ct. at 1764.

At this point it might appear upon the basis of the principles established in the

---

12. Mr. Justice Douglas' supporting footnote 20 read as follows:

" 'In the parochial schools Roman Catholic indoctrination is included in every subject. History, literature, geography, civics, and science are given a Roman Catholic slant. The whole education of the child is filled with propaganda. That, of course, is the very purpose of such schools, the very reason for going to all of the work and expense of maintaining a dual school system. Their purpose is not so much to educate, but to indoctrinate and train, not to teach Scripture truths and Americanism, but to make loyal Roman Catholics. The children are regimented, and are told what to wear, what to do, and what to think.' L. Boettner, Roman Catholicism 360 (1962)."

13. The Ordinaries of the places (the residential bishops) have the right and duty to watch that in any schools within the territory nothing is taught and nothing is.done which is contrary to faith or good morals. The bishops "have also the right to approve teachers and textbooks of religion; and also to demand in the interest of religion and morality that either teachers or books be removed . . . ." Bouscaren and Ellis, *supra* at 747.

Supreme Court cases that enforcement should be denied because the permeation of religion throughout the entire curriculum of the schools is such that the Board finding them to be only religiously associated constituted an abuse of the Board's discretion. The Board, however, also contends that if it cannot exempt from its jurisdiction schools which are "completely religious," or for that matter, schools which are "partly religious" or even "religious in some degree," it would follow that the Board would necessarily have to assert jurisdiction over all religious schools in view of the otherwise inclusive scope of the statute under which it operates. Because of this position, we find it necessary to turn to the larger constitutional question.

We find ourselves, however, in agreement with the employers' contention that the very threshold act of certification of the union necessarily alters and impinges upon the religious character of all parochial schools. No longer would the bishop be the sole repository of authority as required by church law. Canon 1381. As the Board recognizes, the bishop has now to share "some decision-making" with the union and, as a practical matter, must now consult the lay faculty's representative on all matters bearing upon the employment arrangement. As Professor Brown, Associate Dean of Yale Law School, has observed:

> Once a bargaining agent has the weight of statutory certification behind it, a familiar process comes into play. First, the matter of salaries is linked to the matter of workload; workload is then related directly to class size, class size to range of offerings, and range of offerings to curricular policy. Dispute over class size may also lead to bargaining over admissions policies. This transmutation of academic policy into employment terms is not inevitable, but it is quite likely to occur.

Brown, *Collective Bargaining in Higher Education*, 67 Mich.L.Rev. 1067, 1075 (1969).

In a law review article several years later quoting the above statement of Professor Brown, it is stated that from the evidence of contracts which have already been negotiated Professor Brown's views appear to be correct. Kahn, *The NLRB and Higher Education, supra* at 80. The later article points out that the National Labor Relations Act which was designed and has been administered according to traditional collective bargaining doctrines is inappropriate for higher education. The faculty's bargaining interests, the article points out, extend beyond the traditional scope of collective bargaining and, at least as to the faculty of a college or university, "the term 'conditions of employment' has a meaning which leaves very little not subject to bargaining." *Id.* at 79. A report quoted in the article points out because faculty members are both professionals and employees their interests span a wide range of substantive issues, the resolution of which will determine the role of the institution and the status and opportunities of the individual faculty members. First among the categories considered to be of legitimate interest are educational and administrative policies. *Id.* at 80. While the article in question is directed at the college level,[14] we are unaware of any reason that the same approach would not be involved in the secondary schools by the professional lay teachers there employed.

The Board's order to bargain unquestionably, in our opinion, inhibits the bishops' authority to maintain parochial schools in accordance with ecclesiastical concern. If a bishop, for example, should refuse to renew all lay faculty teacher contracts because he believed that the union had adopted policies and practices at odds with the religious character of the institutions, or because he wanted to replace lay teachers with reli-

---

14. We emphasize, as we did in connection with our discussion of *Wentworth, supra,* that we do not herein question the correctness of the exercise of Board jurisdiction over private, non-sectarian schools. Our inclusion of references to the Brown and Kahn articles is not intended to reflect any change of position on the *Wentworth* premise but is to demonstrate what we regard will be the inevitable tenor and direction of negotiations on conditions of employment between professional faculty members and school administrators at all educational levels.

gious-order teachers who had become available, under ecclesiastical law he would have the right if not the duty to take that action. Yet, under the National Labor Relations Act, he might well be found guilty of an unfair labor practice. 29 U.S.C. § 158(a)(1), (3) and (5). *See, e. g., NLRB v. Burnup & Sims, Inc.,* 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). The real difficulty is found in the chilling aspect that the requirement of bargaining will impose on the exercise of the bishops' control of the religious mission of the schools. To minimize friction between the Church and the Board, prudence will ultimately dictate that the bishop tailor his conduct and decisions to "steer far wider of the unlawful zone" of impermissible conduct. *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). If, for example, a teacher should give a strong pro-union speech at a meeting one week and the next week would advocate the cause of birth control to his or her students or favor the availability to poor people of abortion, the bishop would be confronted with a choice of foregoing his right to discharge the heretical employee or do so at the risk of a protracted and expensive unfair labor practice proceeding before the Board which would certainly in part involve the Church's religious policies and beliefs.

In sum, it is unrealistic to say that an employer which has to honor a bargaining order is not substantially inhibited in the manner in which it conducts its operations. This is true of all bargaining orders but on the general industrial and commercial scene sound policy considerations have upheld this imposition, inhibiting though it may be, which policy declarations are found at 29 U.S.C. §§ 141 and 151. We do not disagree with the soundness of the legislative policy determinations which have been consistently upheld by the courts. We only say that when that imposition conflicts with the Religion Clauses that the First Amendment protective wall should prevail. *See Sherbert v. Verner,* 374 U.S. 398, 406–09, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

We, of course, must recognize that there are permissible governmental impinge-

ments upon the operation of the church schools. Chief Justice Burger in *Lemon, supra* 403 U.S. at 614, 91 S.Ct. 2105, pointed out that the prior holdings of the Court do not call for total separation between Church and State; total separation not being possible in an absolute sense. The opinion then indicated that some relationship between government and religious organizations was inevitable such as fire inspections, building and zoning regulations, and state requirements under compulsory school-attendance laws. These were listed as examples of necessary and permissible contacts. To the extent that it is argued that the present Board action is similar to these necessarily permissible contacts, we do not agree. Laws on matters such as fire inspections and compulsory attendance do not have the clear inhibiting potential upon the relationship between teachers and employers with which the present Board order is directly concerned.

Further, the type of governmental restrictions found in laws pertaining to zoning, school-attendance, and similar subjects involve a distinction which has been recognized in the parochaid cases as significant with regard to the matter of aid and conversely it would seem should be significantly applicable to the inhibiting side of the coin. Thus, in *Nyquist, supra* 413 U.S. at 782 n.38, 93 S.Ct. at 2970, the Court stated the following: "*Allen* [*i. e., Board of Education v. Allen,* 392 U.S. 236, [88 S.Ct. 1923, 20 L.Ed.2d 1060] (1968)] and *Everson* differ from the present litigation in a second important respect. In both cases the class of beneficiaries included *all* schoolchildren, those in public as well as those in private schools. See also *Tilton v. Richardson, supra,* [403 U.S. 672, [91 S.Ct. 2091, 29 L.Ed.2d 790] (1971)] in which federal aid was made available to *all* institutions of higher learning, and *Walz v. Tax Comm'n, supra,* in which tax exemptions were accorded to *all* educational and charitable nonprofit institutions." (Emphasis in original.) The inhibiting restrictions resulting from the Board's determination that it will exercise jurisdiction over parochial secondary schools

is not applicable to the great bulk of the secondary schools in this country being, of course, public schools which are operated by political subdivisions of states which are expressly exempted from the definition of "employer." 29 U.S.C. § 152(2).

The Board concedes that "disputes in parochial schools may well involve issues of religious doctrine," but asserts that its only concern in deciding disputes would be focused on the commission of unfair labor practices which are inherently unrelated to differences of religious interpretation. The Board further contends that even if it were to intrude into doctrinal matters, inadvertently or otherwise, the remedy would be, not to strip it of its general jurisdiction to adjudicate underlying unfair practice disputes, but simply to require it to decide its case without regard to the merits of the alleged doctrinal issues. We have difficulty in following the Board's rhetoric. We are unable to see how the Board can avoid becoming entangled in doctrinal matters if, for example, an unfair labor practice charge followed the dismissal of a teacher either for teaching a doctrine that has current favor with the public at large but is totally at odds with the tenets of the Roman Catholic faith, or for adopting a lifestyle acceptable to some, but contrary to Catholic moral teachings. The Board in processing an unfair labor practice charge would necessarily have to concern itself with whether the real cause for discharge was that stated or whether this was merely a pretextual reason given to cover a discharge actually directed at union activity. The scope of this examination would necessarily include the validity as a part of church doctrine of the reason given for the discharge.

That these paradigmatic situations proposed above are not merely fanciful horror tales devised by an employer who seeks to avoid labor board jurisdiction is rather persuasively demonstrated by charges that have actually been filed as demonstrated by one employer's brief.

The summary in one of the briefs is as follows:

Three unfair labor practices charges have been filed with respect to the very schools involved in this case. In Case No. 25–CA–7932–3 filed May 7, 1976 with NLRB Region 25, Indianapolis, Indiana, for example, the Union charged that the Diocese committed an unfair labor practice when it refused to offer a teacher a contract. The Diocese responded that the teacher's contract was not renewed because *inter alia* she exposed biology students to sexual theories of Masters and Johnson that were contrary to the teachings of the Catholic Church. In Case No. 25–CA–7932, filed May 4, 1976, with NLRB Region 25, Indianapolis, Indiana, to cite another example, a similar charge was filed because the Diocese refused to renew a teaching contract. The Diocese responded that the teacher's contract was not renewed because the teacher married a divorced Catholic and was no longer in good standing with the Church. The third case, Case No. 25–CA–7932–2, was filed May 7, 1976, with NLRB Region 25, Indianapolis, Indiana. The Diocese refused to renew a teaching contract because the teacher was unwilling to structure a course in religion as directed by the principal and chairman of the religion department. Whether these actions constitute firing for cause is for the Board to decide. *Compare* 29 U.S.C. § 160(c). To make such decisions, however, the Board inevitably must assay the moral teachings of the Church there at issue and delve into two thousand years of religious tradition.[15]

The same brief also refers to an unfair labor practice charge by a teacher at the parochial high school in the diocese of Gary, Indiana, which charge was a part of the subject of the action involved in *Grutka, supra*. The charge there was that the recitation of a prayer by the Catholic bishop of the diocese interfered with employees' rights and the Board's complaint as filed

---

**15.** The sixth and seventh sentences of this extract appeared in a footnote in the employer's brief. They have been relocated in the quoted extract for purposes of clarity.

according to the employers' briefs read in part as follows:

"On or about the dates set forth below in 1976, and at the place set forth below, the Respondent, by and through its supervisors and agents named, did:

(a) Make implied promises of benefit and threats of reprisal to induce employees to cease their union activities and to cease their affiliation with the American Federation of Teachers by reciting to said employees a prayer entitled 'Repent Ye Sinful Children;' and in reading aloud to said employees the General Epistle of Saint James, Chapter 4, Verses 1–10—Father Casimer Senarik and Father Sierkierski—February 26 at the residence of Bishop Andrew G. Grutka."

We are advised that subsequent to the filing of the employers' original briefs this particular charge was dismissed by an Administrative Law Judge. It is of interest to note, however, that the charge was dismissed only after three days of testimony and 531 pages of transcript. We agree with the employers that such a dismissal does very little to establish the Board's sensitivity to the principles of the Religion Clauses.

The Board also argues what appears to be a "case or controversy" contention by arguing that the asserted constitutional injury cannot be merely speculative but must be demonstrable reality or as the matter was phrased during oral argument, there conceivably could be a problem "down the line" which would have to be litigated at some subsequent time but that there is no present problem. As we have already indicated, we do not regard the exposure which the certification forces upon the two bishops to be speculative or fanciful. The whole tenor of the Religion Clauses cases involving state aid to schools is that there does not have to be an actual trial run to determine whether the aid can be segregated, received and retained as to secular activities only but it is sufficient to strike the aid down that a reasonable likelihood or possibility of entanglement exists. Thus, we find the language in *Lemon,* 403 U.S. *supra* at 619, 91 S.Ct. at 2114, concerning a difficulty in "the *possibility* of disagree-

ment between teacher and religious authorities over the meaning of the statutory restrictions." (Emphasis added.) Also in the same case we find, at 620, 91 S.Ct. at 2115, the language: "This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids. It is a relationship *pregnant with dangers of excessive government direction* of church schools and hence of churches." . . . "[W]e cannot ignore here the danger that pervasive modern governmental power will *ultimately* intrude on religion and thus conflict with the Religion Clauses." (Emphasis added.)

Likewise the Court in *Walz supra* 397 U.S. at 674, 90 S.Ct. at 1414, had no difficulty in forecasting the reasonably-to-be-expected result from the elimination of the real estate tax exemption for church property as including tax foreclosures:

Elimination of exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes.

To anticipate that tax foreclosures would follow in the train of the legal processes would require that the no longer exempt church would be unable or unwilling to pay its real estate tax and would be confronted with a tax foreclosure suit. The certitude of entanglement with doctrinal matters in our opinion is much greater in the present case than the possibilities involved in *Walz.*

Both the union and the Board rely heavily upon the early case of *Associated Press v. NLRB,* 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937), and argue that the question before this court is no different in principle than the question before the Court in the earlier case. We find the reliance misplaced. We do not read *Associated Press* as really having anything to do with freedom of the press under the First Amendment. The case that came before the Court in *Associated Press* did not and we do not see

how it could have involved freedom of the press. Very simply the case that came before the Court involved an employee who was discharged for his activities in connection with the Newspaper Guild. *Id.* at 125, 57 S.Ct. 650. In its answer before the Board the employer had denied that the discharge was due to Guild activities. Apparently there had been a contention before the Board that the discharge was solely on the grounds of the work not being on a basis of which he had shown capability. This contention was not pursued in the Supreme Court which, as stated above, had an unchallenged situation before it of discharge for union activity.

It is true that the Court purported to address First Amendment freedom of speech and freedom of press questions but held that the statute as applied to the petitioner did not abridge these freedoms. The Court made it clear that the application of the Act to the Associated Press did not in any way interfere with its freedom not to employ or not to retain an incompetent editor or one who failed to edit the news to reflect the facts without bias or prejudice. This involved simply a matter common to all employers of not hiring or retaining an employee who would not or does not carry out directions or instructions or subverts those directions. Failure of a newspaper employee to carry out a publisher-employer's policy would not bear on freedom of the press; a failure of a lay teacher to carry out a bishop-employer's policy would directly interfere with the exercise of religion.

Reasons for discharge other than for union activity prohibited by the Act in the case of the news media would as we see it have nothing to do with freedom of the press, whereas in the cases before us as we have indicated hereinbefore doctrinal reasons or violation of doctrinal or church principles would directly concern the Religion Clauses of the First Amendment. In sum, the right of the Associated Press either to discharge or not to hire an employee because of incompetency or for any other reason other than those protected by the Act would not in our opinion be dependent upon or in any way related to its right of press freedom, a freedom belonging to it by virtue of the Constitution. That, as has been said, is not true of the situation involved in the cases here under consideration.

We are not unmindful that the four dissenting justices rested their disagreement upon their fears that the majority opinion constituted an infringement upon the freedom of the press. The rationale of the dissent, however, was that "freedom of the press" obviously meant more than publication and circulation but included the right to adopt or pursue a policy without governmental restriction. *Id.* at 137, 57 S.Ct. 650. The dissenters accepted as true the statement of the reason for the discharge but stated that they were "of opinion that the constitutional immunity of the press does not permit any legislative restriction of the authority of a publisher, acting upon his own judgment, to discharge anyone engaged in the editorial service," terming such a restriction in itself to be an abridgement of the freedom of the press. *Id.* at 137–38, 57 S.Ct. 650, 658.

In *Associated Press*, as the majority points out, even the ostensible claim before the Board was that the discharge was on a matter of capability and there was no claim before the Board nor a claim before the Court that the employee would show bias in his future reporting or editorial work. This was too much a non-existent and an assumed circumstance without any basis in fact for the Court to address the matter. On the other hand, in the situation in which we are involved, we have attempted to demonstrate that the necessity of bargaining and negotiating with faculty members on conditions of employment inevitably involves conflicts concerning the religious program of the schools and infringement of the First Amendment Religion Clauses. Inevitably some of a lay teacher's responsibilities must hover on the imprecise border between religious and secular orientation.

During oral argument, counsel for the Board was asked what the situation would be if a bishop should attempt to discharge a

teacher-heretic and unfair labor practice charges were filed. The Board's counsel expressed the opinion that the Board would be required in that situation to take cognizance of the religious nature of the grounds for discharge and give respect to that. He repeated that the First Amendment would require, in his opinion, the Board to take cognizance of this special kind of reason. He further supplemented the observations by expressing the opinion that the Board would be compelled "to try to make some reasonable accommodation to the religious purposes of the school." He thought that the First Amendment demanded at least that, and it was his understanding that the Board would not order reinstatement of a heretic in the classroom. He expressed the opinion that such reinstatement would be well beyond the power of the Board. He further differentiated accommodation from entanglement.

Even if we were to assume that the Board in handling parochial school teacher cases would consider itself bound by the statements of its counsel in an oral argument before this court, as to which we must confess extreme skepticism, we have difficulty in finding avoidance of entanglement by the employing bishop in governmental toils in his future conducting of the religious programs of the schools under his aegis.

We direct our attention to just what "accommodation" might mean. We can without citing authority recognize the word "accommodation" as having long definitional experience in the law pertaining to bills and notes or the law merchant. That development of law is little use to us here. More recently the term is periodically found in other areas. Thus, in *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Co.*, 353 U.S. 30, 40, 77 S.Ct. 635, 12 L.Ed.2d 622 (1957), Chief Justice Warren wrote that there had to be accommodation of the Norris-LaGuardia Act with the Railway Labor

Act so that the obvious purpose in the enactment of each was preserved. Significantly, however, in speaking for the Court, he stated that the purposes of the two Acts were reconcilable.[16] Still more recently an area of litigation has developed under Title VII of the Civil Rights Act of 1964, coincidentally implicating Religion Clauses questions. A specific case in this respect is *Cummins v. Parker Seal Company*, 516 F.2d 544 (6th Cir. 1975). That case involved an EEOC regulation, 29 C.F.R. § 1605.1 (1974). This regulation was to the effect that the duty of an employer not to discriminate on religious grounds as required by the Civil Rights Act included an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations could be made without undue hardship on the conduct of the employer's business. *Id.* at 546. The majority of the Sixth Circuit panel held that the religious accommodation rule did not violate the First Amendment with Judge Celebrezze dissenting on constitutional grounds. In *Yott v. North American Rockwell Corporation*, 428 F.Supp. 763 (C.D.Cal. 1977), the district court found itself unpersuaded by the majority in *Cummins* and held that the religion provisions of the Civil Rights Act of 1964 violated the Establishment Clause of the First Amendment of the United States Constitution. A similar question was involved in *Trans World Airlines, Inc. v. Hardison*, —— U.S. ——, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). However, the constitutional issue was not reached because of the Court's disposition of the case, which was that the employer had not violated the Act or the Regulation inasmuch as its conduct constituted reasonable accommodation under the circumstances and in the light of the "undue hardship" standard. Although *Cummins* was affirmed by an equally divided Court, 429 U.S. 65, 97 S.Ct. 342, 50 L.Ed.2d 223 (1976), the Court subse-

---

**16.** We are not, of course, in the present cases concerned with reconciling the purpose of two equal strength statutes. Reconciliation in the statutory situation could reasonably contemplate adjustments. While a statute may be adjusted so as not to offend a constitutional right, we would deem that the reverse route of adjusting the constitutional right so as not to offend the statute, or its application, is one which is not susceptible of pursuit.

quently granted rehearing and vacated its own judgment and that of the court of appeals and remanded for further consideration in the light of the *Trans World Airlines* case. —— U.S. ——, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

This synopsis of recent litigation in the religion area persuades us that at the very least there is a substantial constitutional question presented where what is involved is an "accommodation" or, synonymously, an adjustment or an adaptation or a compromise and settlement involving a First Amendment right. A "reasonable accommodation" by the Board "to the religious purposes of the school" on the presentation of a doctrinal issue in an unfair labor practice case would implicitly appear to us to involve the necessity of explanation and analysis, and probably verification and justification, of the doctrinal precept involved, all of which would itself erode the protective wall afforded by the constitutional right.

If as the Board counsel indicated during oral argument in the present cases, reasonable accommodation would mean that where the religious question was presented for discharge or failure to hire it would override somehow the fact that the discharge or failure to hire was also motivated by anti-union reasons, then it would seem there would be still other substantial constitutional questions presented. At this point putting aside for the moment the fact that even to reach the stage of convincing the Board of the necessity of an accommodation, the bishop, as we have mentioned previously in this opinion, would have to eliminate the pretextual aspect of claimed justification which would involve the matter of showing the validity of the claimed doctrinal position advanced. We are not unmindful in that respect that the freedom of exercise of religion includes adhering to beliefs which may not be generally accepted or may indeed be deemed generally unacceptable but never to the point of being proscribed as a religious belief even though subject to prohibition as a practice, for example, belief in polygamy. The matter of the constitutional toleration of diverse reli-

gious views was aptly stated by Justice Douglas in *United States v. Ballard*, 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944):

The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views. The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. *When the triers of fact undertake that task, they enter a forbidden domain.* The First Amendment does not select any one group or any one type of religion for preferred treatment. It puts them all in that position. [Emphasis added.]

Thus, and applicable to the present context, we can judicially note that there is some division on the acceptability of birth control, and certainly wide division on that of abortion. On the latter, at least, the division of opinion is not merely confined to non-Catholics.

The real difficulty, even if accommodation could otherwise properly be brought to play in the present situation, is that it would run afoul of well-established principles applicable to all other employers in the labor relations area. "[O]nce it has been proved that the employer engaged in discriminatory conduct which could have adversely affected rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." [Emphasis in original.] *NLRB v. Great Dane Trailers, Inc.*, 388 U.S.

26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967). "[T]he rule is well established that although ample valid grounds may exist for the discharge of an employee, that discharge will violate § 8(a)(3) if it was in fact motivated, *even partially*, by the employee's union activity." [Emphasis added.] *NLRB v. The Pembeck Oil Corporation*, 404 F.2d 105, 109 (2d Cir. 1968), *vacated on other grounds and remanded*, 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969).

■ In sum, on this point it appears clear that the existence of a valid ground for discharge is not sufficient, if it was merely a pretext or the discharge was based in part on an unlawful ground. *NLRB v. Advanced Business Forms Corporation*, 474 F.2d 457, 464 (2d Cir. 1973). We fail to comprehend the real possibility of accommodation in the present context without someone's constitutional rights being violated, which in turn would seem to preclude the possibility of accommodation as an answer to the obviation of the religious entanglement problem.

■ In reaching the conclusion that we have in this opinion that those who undertake to teach young people in parochial schools which have been denied state aid because of their pervasive religious nature are as such teachers denied the important protective rights of the National Labor Relations Act, we cannot be unmindful of the substantial importance of the national policy as stated in that Act of "encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151. A church which chooses to educate its own young people in schools which it is required essentially to finance without governmental aid should because of the essentially religious permeation of its curriculum be equally freed of the obviously inhibiting effect and impact of the restrictions of the National Labor Relations Act in conducting the teaching program of those schools. We, of course, would assume that a church so choosing would usually not itself be unmindful of the desirability of affording its young people an education which would suitably equip them mentally for participation in daily life and that this obvious desire will require the securing and retention of teachers of competence, many of whom in this day and age will not be altogether motivated in seeking employment by the love of the institution which they are serving.

Having indicated our holding on these cases, we add comments on two matters.

The first matter is an economic one. In our research we had occasion frequently to note references of one sort or another to the fact that private education has played and is playing a significant and valuable role in raising national levels of knowledge, competence, and experience, that these schools are confronted with increasingly grave fiscal problems the resolution of which by increasing tuition charges forces parents to turn to the public schools and that this in turn exacerbates the problems of public education at the same time that it weakens support for the parochial schools. *See, e. g., Nyquist, supra*, 413 U.S. at 795, 93 S.Ct. 2955.

We now learn that during the present year the Vatican for the first time has called for government financial support of the world's Roman Catholic schools, warning that in the present situation these schools could be more and more frequently available only to the rich without public aid.[17]

While the fact that the abolition of parochial schools would undoubtedly throw a tremendous financial burden upon taxpayers whose already heavy school tax costs are reduced by the substantial numbers of students in parochial schools, nevertheless the economic factor has not been a persuasive one, and, in fact, has not been given

17. Chicago Sun-Times, July 6, 1977, at 4.

a decisional aspect in the parochaid cases. Indeed, in *Nyquist, supra* at 795–96, 93 S.Ct. 2955, the Court pointed out that the economic factor if anything militates against state aid and that increasing state aid could lead to divisiveness related to religious beliefs and practice and the need for continuing and increasing annual appropriations. We do observe, however, that an even-handed approach to justice might seem to suggest that the Religion Clauses, serving as they do as a buckler to stop financial aid to these schools should not now be any less effective to ward off the inhibiting effect of the governmental regulation here involved.

Secondly, we have generally in this opinion referred to the Religion Clauses rather than dwelling on the differentiations between the dual aspects of the Religion Clauses of "establishment" and "free exercise" of religion. Our treatment of the Religion Clauses jointly has been because of our belief that there has been some blurring of sharply honed differentiations. Even though "establishment" may at one time have been construed to mean establishing a state religion, it is no longer so but as is pointed out in *Lemon, supra*, 403 U.S. at 612, 91 S.Ct. 2105, a key word in the First Amendment is "respecting" and that a law may be one "respecting" a forbidden objective while falling short of its total realization. There are substantial aspects in the present cases, in our opinion, not only of sovereign involvement in the religious activity under the establishment clause but there is undoubtedly, in our view, also curtailment of the free exercise of religion under the second prong of the Religion Clauses. Under these circumstances we have felt it sufficient to leave the matter of disposition jointly on the Religion Clauses, each of which has the identical purpose of maintaining a separation between Church and State.

For the reasons set forth herein, the orders of the National Labor Relations Board in these cases dated June 18, 1976, are hereby set aside and the Board's cross-applications for enforcement of said orders are denied.

SPRECHER, Circuit Judge, concurring.

In concurring with Judge Pell's persuasive opinion, I would only add that the National Labor Relations Board, in attempting to steer a course between the Scylla and Charybdis of the Establishment and Free Exercise Clauses, has collided with one and fallen into the other. The Board's assertion of jurisdiction will have the effect of inhibiting the practice of religion by regulating it, yet by conceding that this will inexorably force it to "accommodate" and prefer religious employers and conversely to discriminate against secular employers in like situations, it will in the constitutional sense "establish" the religions with which it deals.